# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSE M. RIDDLE,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>　　　　Defendant. | Case No. 1:12-CV-01680-SMS<br><br>ORDER REVERSING AGENCY'S DENIAL OF BENEFITS AND REMANDING FOR FURTHER PROCEEDINGS |

Plaintiff Rose M. Riddle, proceeding *in forma pauperis*, by her attorneys, Dellert Baird Law Office, seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits (DIB) pursuant to Title II, and supplemental security income ("SSI") pursuant to Title XVI, of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, U.S. Magistrate Judge. Following a review of the complete record and applicable law, the Court finds that the decision of the Administrative Law Judge ("ALJ") failed to adequately address Plaintiff's ability to perform past relevant work.  Accordingly, the Court remands for further proceedings in conformity with this decision.

///

///

# I. Administrative Record

## A. Procedural History

Plaintiff filed an application for disability insurance benefits on October 15, 2008. On June 5, 2009, Plaintiff applied for supplemental security income. In both claims, she alleged disability beginning July 1, 2007. The Commissioner initially denied the claims on March 6, 2009, and upon reconsideration, on April 22, 2009. On June 9, 2009, Plaintiff filed a timely request for a hearing.

Plaintiff appeared and testified at a video hearing on June 25, 2010.[1] On September 13, 2010, Administrative Law Judge Howard K. Treblin denied Plaintiff's applications. The Appeals Council denied review on August 13, 2012. On October 11, 2012, Plaintiff filed a complaint seeking this Court's review.

## B. Factual Record

Plaintiff (born June 17, 1952) incurred a shoulder injury on March 26, 2003, while working as a caregiver at a retirement home.[2] A patient grabbed her forearm and jerked, pulling Plaintiff's shoulder in an anterior direction and causing her to fall. Plaintiff received immediate treatment in the emergency room at Modesto Sutter Hospital, where doctors diagnosed a shoulder dislocation with a sprain/strain and tendon injury. Her shoulder was not fractured. Plaintiff experienced moderate to severe pain. An initial evaluation reported good medial ulnar nerve function, good radial ulnar artery function, no gross deformity, and a diminished range of motion. Plaintiff had lost about 40 degrees of abduction and was unable to raise her arm above her head.

Initial follow-up care was provided by Harris Shapiro, M.D., at California Occupational Physicians. Left shoulder x-rays were negative. The MRI showed no definite rotator cuff abnormalities, but radiologist Michael R. Tekautz, M.D., opined that changes in the acromial joint and anterior acromion were causing impingement. He recommended clinical correlation with the MRI findings. On April 18, 2003, Plaintiff was referred to an orthopedist.

Orthopedist John Leicham, M.D., examined Plaintiff on April 30, 2003. The severity of her pain hampered the examination. Plaintiff was experiencing severe pain with any movement, but

---

[1] Plaintiff appeared in Stockton, California; the ALJ presided by video from San Diego, California.
[2] Because Plaintiff incurred her shoulder injury on the job, medical care was provided through a workers' compensation plan.

particularly with lifting and abduction, and particularly at night. The pain was inside her shoulder and sometimes down to her elbow. She periodically experienced tingling in the two ulnar fingers for up to one-half hour at a time. Range of motion was markedly decreased. Dr. Leicham injected xylocaine and dexamethasone, which relieved her pain somewhat, but not substantially.

Although Plaintiff reported some improvement on May 28, 2003, Dr. Leicham noted that injections relieved only about half of her pain. She had noticed popping in her shoulder. Although her range of motion had improved since the accident, it was not normal, and adduction caused pain. The Hawkins sign was positive.

On July 9, 2003, Dr. Leicham noted that Plaintiff continued to experience pain, which he diagnosed as degenerative arthritis in the acromioclavicular joint and impingement syndrome of the left shoulder with incidental bicipital tendinitis secondary to the arthritis. Because physical therapy and cortisone injections had not helped her, Dr. Leicham requested authorization to perform an arthroscopic inspection of the shoulder followed by decompression and the Mumford procedure.

On July 29, 2003, Plaintiff was admitted to Stanislaus Surgical Hospital for left shoulder arthroscopy, acromial decompression, and a Mumford procedure. The surgery confirmed Dr. Leicham's prior diagnosis. Plaintiff returned home the same day.

On September 11, 2003, Plaintiff was experiencing continued shoulder pain, popping in her shoulder, and decreased range of motion. Dr. Leicham prescribed a one-month trial of ibuprofen and Norco, and referred Plaintiff for six weeks of physical therapy for "strengthening." AR 239.

On October 23, 2003, Plaintiff continued to experience severe shoulder pain, which had worsened following an abduction stretch performed in physical therapy two or three weeks earlier. Range of motion was markedly decreased. Plaintiff could not lift her left arm. Rotation of the joint caused crepitis. Dr. Leicham suspected a neuroma or scar. Noting that Plaintiff's pain was much worse than would be expected, he injected two areas with xylocaine and Decadron. Injection into the suspected neuroma had no effect, but injection into the subacromial bursa helped Plaintiff's pain. X-rays of Plaintiff's shoulder on October 27, 2003, showed no significant bony, soft tissue, or articular abnormality.

///

At an appointment with Dr. Leicham on November 6, 2003, Plaintiff complained of continued shoulder pain. She exhibited decreased range of motion and marked tenderness over the acromioclavicular joint. The Hawkins, cross-chest abduction, and palm-up abduction tests were all markedly positive. Dr. Leicham ordered an MRI as well as testing to rule out infection.

As a result of continued pain, a post-surgical MRI was performed on December 6, 2003. Radiologist Gordon Zink-Brody, M.D., saw no rotator cuff or labral tear but identified a small subdeltoid bursal effusion. On December 11, 2003, Plaintiff continued to experience pain, and her range of motion had not improved. Dr. Leicham's review of the x-rays indicated successful decompression. He requested an additional review by Dr. Zink-Brody and a second orthopedic opinion.

On February 26, 2004, orthopedist Teresa Schully, M.D., a hand specialist, provided a consultation for Dr. Leicham. Plaintiff told Dr. Schully that her discomfort was 8 on a scale of 0-10, comprised of sharp, dull pain that was worse at night and during activity. Plaintiff was taking ibuprofen and Vicodin. Dr. Schully asked to review the x-rays and MRI studies herself to determine whether the surgery adequately decompressed Plaintiff's shoulder. If the decompression was satisfactory, Plaintiff could either be treated conservatively, perhaps receiving an injection, or receive revision surgery. Dr. Schully suggested consultation with a pain management specialist.

On March 8, 2004, Dr. Leicham acknowledged Dr. Scully's consultation and opined that if Plaintiff did not improve by summer, a repeat decompression should be done.

On August 26, 2004, Dr. Schully issued a primary treating physician's progress report that acknowledged Plaintiff's persistent pain, consisting of soreness on the top of the shoulder and pain radiating down to the elbow. Based on the December 2003 MRI report, Dr. Schully noted that the surgery was successful but the bursa was inflamed. Physical examination revealed reduced range of motion of the left shoulder, although it was not frozen, and poor resistive strength. Plaintiff did not tolerate well passive manipulation of her shoulder. She had a positive impingement sign. Dr. Schully recommended an injection or a pain consultation.

///

///

4

When Plaintiff saw Dr. Leicham on September 14, 2004, she declined a pain injection, requesting that she be determined to be permanent and stationary, and be referred for retraining.[3] The doctor noted that anti-inflammatory medicines, physical therapy, and injections had all been administered without providing continued pain relief. Following a physical examination, Dr. Leicham opined that Plaintiff could not "return to her usual occupation since she has marked limitations in the use of her upper left extremity," but could perform lighter work in conformance with the recommendations in the balance of his report. AR 210. The recommendations included not lifting more than ten pounds with her left arm, and not lifting or working above shoulder height with her left arm at any weight; no repetitive work of any kind just at or below shoulder level; and no work with her arm abducted or anterior flexed more 45 degrees. In the future, she might require mild over-the-counter analgesic or anti-inflammatory medication or, if the pain became worse or more focused, additional surgery. If necessary, Plaintiff could also be referred for pain management services. Finally, Dr. Leicham discharged Plaintiff from his care, noting that he could do nothing further.

Thereafter, Plaintiff attempted to return to work on several occasions, attending training to work in home care and at Target, and working briefly as a cashier at the Dollar Store. In each case, she was unable to perform the work.

Agency physician Nalim Tella, M.D., prepared a physical residual functional capacity assessment on December 11, 2008. Noting that no recent medical evidence had been provided, Dr. Tella based his recommendations on medical reports available for the period from March 26, 2003 to September 30, 2004. The doctor opined that Plaintiff could occasionally lift ten pounds and frequently lift less than ten pounds with her left arm, and could stand or walk six hours in an eight-hour work day. She had unlimited ability to push and pull using hand or foot controls. With her left arm, Plaintiff had limited ability in reaching and handling, but unlimited ability in fingering and feeling.

Consulting orthopedist Cesar P. DuClair, M.D., prepared a two-page report for Health Analysis, Inc., dated January 31, 2009. Although the report refers to "see[ing] this claimant in

---

[3] Plaintiff later participated in retraining programs for computers and real estate.

consultation" (AR 296), it is unclear from the perfunctory report whether Dr. DuClair actually examined Plaintiff or merely reviewed her medical records. Dr. DuClair noted reduced range of motion in Plaintiff's left shoulder. Diagnosing internal derangement of the left shoulder, the doctor opined that Plaintiff had unrestricted ability to stand or walk in an eight-hour work day; had unrestricted ability to sit in an eight-hour work day; was able to left ten pounds frequently and 20 pounds occasionally; had no postural limitations; and could only occasionally reach, handle, feel, or finger with her left upper extremity.

Nothing in the record indicates that Plaintiff saw Michael Schorr, M.D., before March 20, 2009, when he appears to have conducted an initial (new patient) examination of Plaintiff.[4] Plaintiff told Dr. Schorr that Tylenol had stopped relieving her long-term shoulder pain, which had gotten worse. She requested a stronger prescription for her pain. The notes indicate that Plaintiff had not had routine medical care for many years. On April 2, 2009, Dr. Shorr, M.D., diagnosed chronic left-shoulder pain. He noted that Plaintiff's shoulder was still sore, prescribed Celebrex and Vicodin for night time, and noted that injections had not worked in the past. Plaintiff's shoulder pain was not noted on subsequent visits for removal of a mole and treatment of bronchitis.

**Plaintiff's testimony.** Plaintiff completed twelfth grade. At the time of application, she lived with her retired husband, her daughter, and son-in-law. (In a 2012 note to the agency, Plaintiff reported that her husband had left her and that she had been unable to secure a job that did not require lifting.)

About a year before the hearing, Plaintiff worked part time as a cashier in the Dollar Store for three or four months before she was fired for being unable to do the work quickly. From 1978-1998, she worked full time as an engineering tech in the electronics industry,[5] running a machine that tested mass to make resistors. That job required her to sit or stand at the machine, aligning plates using two computer mice, one in each hand. She lifted only masks that were approximately the size

---

[4] Other than care for her injured shoulder, which was provided as a worker's compensation benefit, the record indicates that Plaintiff has generally not received routine medical and dental care for some time. (For example, the anesthesiologist's report at the time of her shoulder surgery revealed numerous dental health issues attributable to lack of regular, routine care.) The record does not indicate whether Plaintiff was unable to afford medical and dental care or whether she avoided such care for one or more other reasons.

[5] Note that Plaintiff described her prior job as "engineering tech," but the ALJ deemed her an "electronics assembler." Nothing in the record explains whether these two titles describe the same position or whether one is more accurate than the other.

6

of a CD cover. From 1999 to 2000, she worked part-time as a security guard. Plaintiff testified that her employer did not offer her full-time work as a security guard. From 2001 until her injury in 2003, Plaintiff worked as a caregiver in a retirement home. The record does not disclose why she made any of the various job changes.

Since Plaintiff's shoulder surgery, she was unable to walk or to sit for long periods. She had back and neck pain, which she treated with Vicodin. Because the medication did not always work, she was "pretty much in pain all the time." AR 44. Vicodin made her dizzy, sleepy, and nauseous. The fingers of her left hand sometimes were numb, causing her to drop things and impairing her ability to use a knife and fork. She had difficulty thinking, concentrating, and remembering.

Plaintiff estimated that she could lift less than ten pounds with her left hand but could lift twenty or thirty pounds with her right hand. Lifting her left arm above her head was painful; reaching forward or to the side was troublesome. She could sit comfortably for five or ten minutes, could walk twenty or thirty minutes at a time, and had difficulty bending over and getting back up. She is sometimes able to drive. She drove herself thirty miles to the hearing but had to stop and rest on the way. She was right handed.

Plaintiff had difficulty sleeping. Sometimes she had difficulty dressing herself. She spent her days doing housework such as cooking, baking, and dusting. Moving heavy cooking pots was a challenge. Activities such as dusting were difficult since she used her right had to perform the functions of both hands, instead of moving objects with her left hand and dusting with her right, as she used to do. She has given up quilting, crocheting, knitting, and gardening.

Overactivity caused pain. Plaintiff would then lie down with her shoulder propped on a pillow until the pain subsided. She testified that on a typical day, she would lie down six to eight times for ten to thirty minutes. Lying down was not necessarily the most comfortable position: relieving the pain required Plaintiff to get weight and pressure off her shoulder.

///

Plaintiff only visited the doctor to renew her prescriptions. Unless she had more surgery, nothing further could be done for her shoulder. Unhappy with the outcome of the first surgery, Plaintiff was afraid of another operation. Her doctor had told her that the failure of a second operation could result in her completely losing the function of her left arm.

## II.     Discussion

### A.     Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following questions:

| | | |
|---|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two. | |
| Step two: | Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate. | |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four. | |
| Step four: | Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five. | |
| Step five: | Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled. | |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 26, 2003. Her only severe impairment was her left shoulder impairment, which did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.925 and 416.926). Plaintiff was capable of performing the light work as defined in 20 C.F.R. § 416.967 (c), including her past relevant work as an electronics assembler.

### B. Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987). "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's." *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

### C. Plaintiff's Ability to Work as an Electronics Assembler

Plaintiff's sole contention is that substantial evidence did not support the ALJ's conclusion that Plaintiff was capable of performing her prior work as an electronics assembler. As noted above,

9

Plaintiff testified that her prior work required the use of both hands to align plates used to assemble resistors. Since Plaintiff could not use her left arm, she would be unable to perform her specific prior job. Nonetheless, the ALJ concluded that Plaintiff was capable of performing her prior work as an electronics assembler, which he identified as DOT No. 726.684-018, light, SVP 4, as it is generally performed. The Commissioner now argues that the ALJ appropriately determined that Plaintiff could perform that job as it is generally performed in the national economy.

At step four of the five-step sequential evaluation, the claimant carries the burden of proving that she can no longer perform her past relevant work. *Pinto v. Massanari*, 249 F.3d 840, 844 (9th Cir. 2001). Specifically, the claimant is required to prove that she cannot return to her "former type of work" as that work is generally performed, not just that she cannot return to her particular job. *See Villa v. Hecker*, 797 F.2d 794, 798 (9th Cir. 1986). Once the claimant has shown that she can no longer perform her past relevant work, the ALJ has the burden of showing "that, taking into account a claimant's age, education, and vocational background, she can perform any substantial work in the national economy." *Pinto*, 249 F.3d at 844.

Even though the claimant bears the burden of proof at step four, the ALJ still must make the factual findings required to support his conclusion. *Id.* at 844. The ALJ meets this burden by making specific findings regarding the claimant's residual function capacity, the physical and mental demands of the past relevant work, and the relation of the claimant's residual functional capacity to the past work, both as it is generally performed in the economy and as the claimant actually performed it in her prior work. *Id.* at 845. At step four, the ALJ must make specific findings on all three elements "to ensure that the claimant really can perform his or her past relevant work." *Breed v. Massanari*, 18 Fed.Appx. 505, 507 (9th Cir. 2001), *quoting Pinto*, 249 F.3d at 845. The hearing decision includes extensive consideration of Plaintiff's residual functional capacity: Plaintiff does not object to that portion of the hearing decision.

10

Plaintiff's argument is limited to the ALJ's consideration of her ability to perform her past relevant work as an engineering tech. At step four, the ALJ must first determine whether the claimant is able to do her past relevant work as she actually performed it. SSR 96-8p at *3 (July 2, 1996). If the ALJ concludes that the claimant cannot perform her prior relevant work as she actually performed it, he must make a function-by-function analysis of the claimant's limitations or restrictions and compare these to the past relevant work as it is generally performed in the national economy. *Id.* at *4. The Ruling warns that the failure to explicitly enumerate a claimant's limitations and restrictions, including those that are not severe, can result in an erroneous finding that the claimant is or is not disabled. *Id.* at *4-5. It emphasizes that even nonsevere limitations, in combinations with those found to be severe, may narrow the range of the work that the claimant has the capacity to perform. *Id.* at *5. The hearing decision must examine both the claimant's exertional capacity (that is, limitations and restrictions derivative of physical strength) and nonexertional capacity (limitations and restrictions that are not reflected in assessments of strength). *Id.* at *5-6.

No vocational expert testified at the hearing of Plaintiff's application.  In concluding that Plaintiff had the residual functional capacity to perform her prior work in the electronics industry, the hearing decision consists of two sentences and totally omits consideration of Plaintiff's ability to perform her prior work as she actually performed it:

> The claimant has past relevant work as an electronics assembler (DOT No. 726.684-018, light, SVP 4).  In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds the claimant is able to perform is as it is generally performed.

AR 33.

No evidence in the record supports the ALJ's finding that Plaintiff's prior work was appropriately classified as DOT No. 726.684-018.   No vocational expert testified. The DOT is the best source for how a job is generally performed. *Gunther v. Commissioner Social Security Admin.*, 804 F.Supp.2d 1079, 1084 (D.Ore. 2011).

11

Nonetheless, every occupation involves varying tasks and differing levels of exertion. *See Carmickle v. Commissioner, Social Security Admin.*, 533 F.3d 1155, 1166 (9th Cir. 2008). Here, the DOT includes at least three job titles apparently similar to Plaintiff's past relevant work, but nothing in the hearing decision articulates why the ALJ chose this job classification over the others as epitomizing Plaintiff's prior work. Proper resolution of step four requires that the ALJ determine whether the claimant can perform his prior work *as properly classified. See id.* at 1166-67 (reversing a determination that overweighted the supervision component of the claimant's prior job); *Gunther*, 804 F.Supp.2d at 1085-86 (reversing denial of benefits where the ALJ had improperly characterized the claimant's work as a related position).

> [W]hen making a finding that an applicant can return to his prior work, the ALJ must directly compare the applicant's remaining functional capacities with the physical and mental demands of [her] previous work. He must make clear factual findings on that issue. The ALJ may not rely on generic classification of previous jobs.

*Latham v. Shalala*, 36 F.3d 482, 484 (5th Cir. 1994).

Without explicit findings regarding the claimant's prior job, a statement that he or she can or cannot perform the prior job "is conclusory and not supported by substantial evidence." *Banks v. Barnhart*, 434 F.Supp.2d 800, 807 (C.D. Cal. 2006). Sources of information that may be used to determine a claimant's past relevant work include a properly completed vocational report and the claimant's own testimony. *Id.* at 806. In this case, the hearing decision does not address in any way whether or not Plaintiff could perform her prior work as she actually performed it. Plaintiff testified that her position as an electronics assembler required the use of two hands to properly align the components of each resistor she was assembled. No evidence suggests that Plaintiff could perform a job in which she had to continually use her left hand to manipulate a computer mouse to align the resistor's components. Indeed, the ALJ found that Plaintiff's residual functional

12

capacity permitted only occasional reaching, handling, feeling, and fingering with her left upper extremity, not the continual use of her left arm to which Plaintiff had testified.

Nor is there substantial evidence to support a conclusion that Plaintiff could perform the work as it is generally performed. No evidence in the record addressed the job's performance in other contexts. To the contrary, even assuming that the ALJ properly identified Plaintiff's prior work as DOT No. 726.684-018, that position requires frequent reaching, handling and fingering of which the ALJ found Plaintiff was not capable. U.S. Dept. of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* at 189 (Employment and Training Admin., 1993). *See Hill v. Barnhart*, 100 Fed.Appx. 664, 665 (9th Cir. 2004) (remanding for further consideration case in which the ALJ concluded that the claimant could perform prior work that was inconsistent with her residual functional capacity). Absent a function-by-function analysis, a Court cannot determine whether the ALJ properly concluded that the claimant really can perform his or her prior work. *Breed*, 18 Fed.Appx. at 508.

### III.     Conclusion and Order

Absent specific findings and analysis, determining whether Plaintiff is able to perform her prior relevant work, which she labeled "engineering tech" and the ALJ labeled "electronics assembler," is impossible. Accordingly, this Court reverses the Commissioner's denial of disability benefits to Plaintiff and remands this case for further proceedings in which the ALJ shall conduct the function-by-function analysis required by SSR 82-62, SSR 96-8p, and *Pinto* and its progeny. The ALJ shall consider all evidence

///

///

13

in the record and, if necessary supplement the record with additional evidence, including but not limited to the testimony of a vocational expert.

IT IS SO ORDERED.

DATED: 8/29/2013                                    /s/ SANDRA M. SNYDER
                                                    UNITED STATES MAGISTRATE JUDGE